Filed 4/28/15  In re M.R. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re M.R., a Person Coming Under the Juvenile Court Law. | C077372 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>SUSAN L.,<br><br>        Defendant and Appellant. | (Super. Ct. No. JD234995) |

Susan L., the mother of 18-year-old M.R., appeals from a judgment of the Sacramento County Juvenile Court adjudging M.R. its dependent, removing him from her care, and ordering reunification services.  On appeal, mother contends the jurisdiction findings and disposition orders are not supported by sufficient evidence.  We will affirm.

1

BACKGROUND

M.R. is a young adult with severe disabilities. He is non-verbal, was diagnosed with autism, and functions at the level of an 18-month-old child. He is unable to care for himself and can only eat pureed or ground up food. M.R. qualifies for services from Alta California Regional Center, which contacts him through mother annually. Mother refused the center's services because she believed it had mistreated M.R. on a prior occasion.

Mother received money from the State of California to care for M.R. She also received an additional $500 from Social Security, presumably per month.

M.R. had a history of 14 prior referrals to the Sacramento County Department of Health and Human Services (Department), starting in 2002 and increasing in frequency prior to his removal in July 2014. The Department disposed of the prior referrals as "inconclusive" or "evaluated out." But the concerns were similar to the allegations of neglect in the present petition, including mother's physical and mental illness or incapacity, her alleged substance abuse and alcoholism, her misusing Valium to make the children sleep during the day while she slept, the lack of adequate food and shelter, the filthy living conditions including toxic mold and dog feces, M.R. being obese, his spending entire days watching television, and mother allowing Patrick H., an alcoholic and drug abuser, to reside in the house and act as a caretaker for M.R.

On May 5, 2014, a referral from an anonymous person stated the following: the home had severe mold; M.R. urinates and defecates on the floor; mother usually keeps a filthy home, is an alcoholic, and is addicted to Vicodin, Soma, vodka and wine; and an unrelated member of the household uses methamphetamine and heroin.

On May 14, 2014, a Department social worker made an unscheduled visit to the home. Mother evidently was not present but a professional respite care worker was providing care for M.R. The respite worker had been caring for M.R. for approximately four years and reported no concerns about M.R. or his family.

2

That same day, a mandated reporter reported that mother was at a hospital with chronic pain issues. Mother was relying on pain medications and consuming medications quickly.

On June 3, 2014, the social worker spoke with M.R.'s teacher. The teacher did not report any concerns regarding M.R. The teacher said M.R. appears healthy and clean, appears to be well fed, and has "great" attendance; mother is appropriate and responds quickly to school e-mails and telephone calls.

On June 12, 2014, the social worker observed the home to be marginally clean but did not observe feces on the floor. There was food in the home; no hazardous conditions or safety concerns were noted. Mother denied alcohol or drug abuse and denied using any medications not prescribed for her. She refused to test for alcohol or drugs.

On June 28, 2014, a mandated reporter informed the social worker that mother had a drug addiction problem. The reporter indicated that mother received resources for rehabilitation but failed to follow through with services. The reporter stated that, according to the maternal uncle, mother consumes alcohol every day.

On July 6, 2014, a mandated reporter informed the social worker that mother was hospitalized due to addiction to Norco and was in a detoxification program. Mother had advised the reporter that her home was "unclean" and had a mold problem.

On July 7, 2014, the social worker spoke with mother at the hospital. Mother said she was being released that day and that M.R. was in the care of Patrick H. A nurse advised the social worker that mother had declined to attend a detoxification program. That same day, the social worker visited the home. It was marginally clean but there was an adequate food supply. Patrick H. was present and caring for M.R. When mother arrived at the house, she refused to release hospital information to the Department, denied alcohol or drug abuse, and again declined substance abuse testing and treatment.

On July 8, 2014, an anonymous reporter advised the Department that mother had asked the reporter for Vicodin and had disclosed to the reporter that mother had

3

consumed morphine she had purchased on the street.  The cleanliness of the home was marginal but not bad enough to remove M.R.

On July 9, 2014, the Department received another referral for general neglect and caretaker incapacity.  The reporter stated that the home had no water, food, or air conditioning; the indoor temperature was 108 degrees; and M.R. was weak from having had nothing to eat for 24 hours.  Mother told a responding social worker that she had been hospitalized two days previously for lack of potassium, dehydration, and withdrawals.  She said she had been hospitalized six times within the last six months and asked that M.R. be removed from her care.  The social worker found running water, electricity and plenty of food in the home.

On July 23, 2014, the social worker learned that law enforcement had received approximately 16 calls from mother's relatives and neighbors since April 2014.  The next day, the social worker received information that mother had called the Citrus Heights Police Department, saying that there were 12 people in her house who were using drugs.  When officers arrived, there was only one additional person in the house and there was food available although the house was "a little dirty."  M.R. appeared to be okay.

On July 28, 2014, Citrus Heights police officers conducted another welfare check and this time placed M.R. in protective custody.  Officers reported that the living conditions were hazardous and unsafe, with feces on the ground, lack of food in the home, multiple empty alcohol bottles all around the residence, and evidence of illicit drug use, including baggies and paraphernalia.  Mother said she is addicted to opiates and was hospitalized for a time.  M.R. was clothed only in a diaper that was so full of feces and urine that it was down at his knees.  M.R. appeared dirty and there were at least seven soiled diapers in his bedroom, which had a strong odor of urine and fecal matter.  There was dried urine and fecal matter throughout the downstairs area of the residence.  The refrigerator contained old food, smelled of sour and spoiled food, and was covered in a black and brown substance.

4

Officers found several baggies of apparent methamphetamine in the bedroom shared by Patrick H. and his girlfriend. Patrick resides in the home and provides care for M.R. in lieu of paying rent. Both Patrick and his girlfriend admitted to law enforcement that they use methamphetamine in the residence while M.R. is present.

That same day, the social worker met with mother. Mother said she was not using alcohol or drugs and refused alcohol and drug treatment. She had not used Vicodin for three weeks and remained sick from detoxing. The social worker observed animal feces in mother's bedroom, upstairs hallway and stair case. She also saw eight to 10 urine-soiled diapers in an upstairs bedroom. The refrigerator was sparsely filled with food that appeared to be old and expired. During the interview, mother lay on the couch and explained she was unable to walk for more than two minutes. She was unable to clean up the diapers and animal feces because she would fall over if she bent down.

The social worker concluded that mother was unable to care for M.R.'s special needs, that she had refused all departmental interventions and help to reduce and mitigate the harm to M.R., and that her behavior placed M.R. at substantial risk of abuse and neglect.

Douglas R., the father of M.R., resides in Hawaii and has not seen M.R. for approximately 16 years.

On July 30, 2014, the Department filed a petition alleging that M.R. came within juvenile court jurisdiction: mother failed to provide adequate care, protection, and shelter in that the condition of her home does not meet basic health and safety standards. (Welf. & Inst. Code, § 300, subd. (b).)[1]

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

The petition also alleged that mother had a substance abuse problem. At the conclusion of the jurisdiction hearing, the juvenile court struck that allegation due to insufficient evidence.

In a July 31, 2014, report for the detention hearing, the Department recommended that M.R. be detained out of the home in foster care. At a hearing that day, the juvenile court authorized continued emergency detention and continued the hearing so that M.R. and his counsel could have in-person contact and an interview. At the continued hearing on August 4, 2014, the matter was again continued because mother was not present due to illness. When the hearing resumed the next day, mother still was not present. The juvenile court found that the Department had made a prima facie showing that M.R. was within the provisions of section 300. The juvenile court ordered M.R. detained from mother.

In an August 25, 2014, report for the jurisdiction and disposition hearings, the social worker described an August 22, 2014, telephone contact with mother. Mother declined to schedule an interview appointment because she was "extremely ill." She explained that since M.R. was removed from her care, she had been bed bound due to "extreme anxiety" and an "unknown physical illness." The social worker found mother "somewhat incoherent" during the conversation. Mother said the social worker could not visit her home because she had "squatters in her home" who "have painted the bedrooms different colors and punched holes in the wall." During the conversation mother "repeatedly mentioned she no longer has income due to [M.R.'s] removal from her care."

Regarding the petition's allegation that mother failed to provide adequate care, protection and shelter in that the condition of her home does not meet basic health and safety standards, the social worker reported that there was a lack of food, M.R. was filthy, and drug paraphernalia and methamphetamine were present and methamphetamine was consumed in the home and the garage.

6

Regarding disposition, the social worker assessed that mother was not capable of providing adequate care, protection, and supervision of M.R. and that the risk of physical harm, abuse, and neglect was high if he were returned to her care. This was because the home does not meet basic health and safety standards and mother was experiencing debilitating mental and physical health issues that rendered her bed bound and unable to provide adequate care. Although M.R. had not previously been removed, there had been multiple referrals with similar allegations of neglect since approximately 2010.

Attached to the social worker's report were Citrus Heights Police Department reports for July 28, 2014, when M.R. was placed in protective custody. The police reports reflect that, when officers arrived at the residence, they found several adults sitting in an open garage. One of the adults was a drug registrant and on searchable probation for a drug offense. Searches of her person, purse, and other property yielded methamphetamine, a counterfeit $100 bill, plastic baggies, and a digital scale. A second adult in the garage was also a drug registrant and also on searchable probation. Both adults had "extensive criminal history including drug related crimes." A search of the garage yielded plastic baggies containing residue and paraphernalia.

Non-relative Patrick H., who resided at mother's residence, told police that he acted as caretaker for M.R. Patrick and his girlfriend were located on the outside patio. Patrick pays no rent and is provided a room in exchange for looking after M.R. His girlfriend had been residing there for the past two months. She was on searchable probation. Several baggies of apparent methamphetamine were found in their bedroom. Both Patrick and his girlfriend admitted to using methamphetamine, and both admitted to having a drug and alcohol problem. The reporting police officer observed, "This is all occurring while they are in the home with [M.R.]."

The police officer stated it was apparent that Patrick was the only person providing care to M.R. and that Patrick appeared to have genuine concern for M.R. But Patrick could not handle caring for the house and for M.R. on his own. Mother provided

7

Patrick no money for food for M.R. and often Patrick had to use his own food stamps to buy M.R. food. Patrick agreed with the officer that M.R. would be better off living in a different environment. Patrick told the officer that mother "does nothing to care for [M.R.] and she often refers to him as her 'Salary.' " The officer requested that the Department respond to the scene and take custody of M.R., which it did.

One of the police officers was familiar with the family and with Patrick, "who was supposed to be the 'caretaker' of [M.R.]." That officer concurred with the decision to place M.R. in protective custody.

Mother did not appear at the September 4, 2014, contested hearing and her counsel did not call any witnesses or present any evidence. Instead, counsel asked that the petition be dismissed in its entirety. Counsel relied on the facts that (1) the respite care provider had reported no concerns for the child and family, (2) M.R.'s teacher had reported no concerns about his attendance or mother's responses to e-mails and telephone calls, and (3) the social workers had visited in June and July 2014 and had found the home marginally clean with adequate food, water, and electricity. Counsel argued that the condition of the home on the date of detention was "not the normal state of things in the mother's home," and that mother "regularly provides care for [M.R.] and has sufficient additional care providers that can care for [M.R.] when she is not in the home."

After hearing the arguments of counsel, the juvenile court responded as follows: "While, [counsel for mother], you have accurately pointed out some portions of the report, you have, obviously, left out others. Yes, the mother has been ill." But as shown in the detention report, "[t]here were several mandated reporters that reported problems in the home. Particularly on . . . June 28th there was a message from the mandated reporter. Per the reporter, the mother has received resources for rehabilitation. The mother has failed to follow through with resources. The maternal uncle disclosed that the mother was consuming alcohol every day. On July 6th there was another message from a mandated reporter. The reporter stated the mother is currently

8

hospitalized . . . due to her addiction to Norco. The mother was in a detoxification program. It was unknown how long the mother would be hospitalized, and there was a concern about what provisions had been made for the child while the mother was hospitalized. [¶] It is undisputed that the child was left in the care of [Patrick H]. [¶] On July 7th, the home was found to be marginally clean. There was an adequate food supply, and [Patrick] was home with the child. However, by July 9th there was a third referral. An emergency response social worker went out to the house. That emergency response social worker indicated there was no food or water in the home, and that the child was weak from not having anything to eat for 24 hours.[2] The mother reported that she had been hospitalized six times within the last six months, and the mother requested the child be removed. [¶] The sergeant reported from the Citrus Heights police office on July 23rd that law enforcement received approximately 16 calls from relatives and neighbors since April 2014. They were all calling concerned about the child and requesting a welfare check of the child, a check on the mother's substance issues, and the conditions of the home. On July 28th, we are all agreed [*sic*] as to the description of the home. The mother on that occasion denied alcohol or drug abuse but did report that she was physically unable to walk for more than two minutes and unable to take proper care of this very special needs 17-year-old child. The mother reported to law enforcement, as reported on page 9 of the detention report, that she and the child needed food. She also reported that the care provider with whom she had left the child and his girlfriend admitted to methamphetamine use, and law enforcement found methamphetamine and drug paraphernalia in the mother's home. It was concluded in the report, the social worker reported that the mother has refused all departmental

---

[2] A reporter alleged there was no food or water and that M.R. was weak; but the social worker found there was running water, electricity, plenty of food, and that M.R. was not in visible distress.

9

interventions that would help to reduce and mitigate the harm to the child, and that the mother was unable to care for this special needs child."

The juvenile court found true the allegation of a failure to protect by a preponderance of evidence.

Following the jurisdiction hearing, the juvenile court heard arguments regarding disposition. The Department's counsel requested that M.R. be removed from mother and placed in the care and supervision of the Department. Mother's counsel stated: "As to disposition, I am entering an objection to out-of-home placement. The mother is requesting that the child be released to her care."

The juvenile court found that the evidence rises to the level of clear and convincing evidence that there was a substantial danger to M.R.'s physical health, safety, and emotional well-being or there would be if he were returned to mother, and his well-being cannot be protected without removing him from his parent.

DISCUSSION

I

Mother contends the juvenile court erred when it asserted jurisdiction over M.R. because the evidence was insufficient to show that he was at substantial risk of future harm. We disagree.

When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing, the reviewing court must determine if there is any substantial evidence -- that is, evidence which is reasonable, credible and of solid value -- to support the conclusion of the trier of fact. (*In re Angelia P*. (1981) 28 Cal.3d 908, 924; *In re Jason L*. (1990) 222 Cal.App.3d 1206, 1214.) In making this determination we recognize that all conflicts are to be resolved in favor of the prevailing party and that issues of fact and credibility are questions for the trier of fact. (*In re Jason L.*, at p. 1214; *In re Steve W.* (1990) 217 Cal.App.3d 10, 16 (*Steve W.*).) The reviewing court may not reweigh the

evidence when assessing the sufficiency of the evidence.  (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.)

Moreover, when the arguments by petitioner "only tend to establish a factual context which, had it been credited by the trial court, might have led to a different decision," such arguments are facially meritless in light of the standard of review in this court.  (*In re Charmice G*. (1998) 66 Cal.App.4th 659, 664 (*Charmice G*.).)

"The question here is whether substantial evidence supports the finding that [M.R.] was, at the time of the hearing, a person described in section 300, subdivision (b). The statutory definition consists of three elements:  (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness."  (*In re Rocco M*. (1991) 1 Cal.App.4th 814, 820; fn. omitted.)  The substantial risk of harm must exist at the time of the jurisdiction hearing.  (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1396.)

Mother claims a "look at the facts of the *John M*. case [*In re John M*. (2012) 212 Cal.App.4th 1117 (*John M*.)] will shed some light on how the juvenile court got things wrong in the present matter" and will show that "juvenile court jurisdiction was not necessary to protect" M.R.  We disagree.  The cases are similar, and *John M*. did not suggest that the facts in that case were a threshold for juvenile court jurisdiction.

Like in *John M*., M.R. is an individual with severe disabilities.  (*John M., supra*, 212 Cal.App.4th at p. 1120.)  And like the child in that case, M.R. was residing in unacceptable conditions and was found dirty, not properly clothed, and unsupervised. (*Id*. at pp. 1120-1122.)  In both cases, the mothers declined regional center services (*id.* at p. 1121) and their conduct demonstrated that the child was at risk of serious physical harm or illness (*id.* at p. 1124).

Mother argues that "[d]espite concerns expressed by several reporting parties, mother's home was found to be inappropriately dirty on one occasion but appropriate on others."  The record shows the following:  The reporters noted dog feces all over the

11

house in September 2010; mold, parasites and toxic waste present in April 2011; mold present in October 2011; M.R. defecating on the floor in April 2012; garbage piled on the deck in August 2013; the house cluttered with trash in September 2013; dog feces on the floor in November 2013; and a filthy house in May 2014. Mother canceled several appointments with the social worker before meeting with the worker for the first time on June 12, 2014. The worker found the residence only "marginally clean" with adequate food and no feces visible on the floor. Almost a month later, on July 7, 2014, the same social worker found the home marginally clean with an adequate food supply. The next day, officers conducting a welfare check found the home's cleanliness marginal but not severe enough to warrant removal of M.R. The day after that, the house was found to have food, electricity, and water. Then on July 24, 2014, an officer found the house "a little dirty." Based on this record, the juvenile court could find that the home's unacceptable condition on July 28, 2014, was not an aberration.

Mother makes much of the fact that a professional respite care provider had worked with mother and M.R. for three to six hours per day, two to three days per week, for approximately four years, and had reported no concerns for M.R. or the family. But the care provider's silence merely "tend[s] to establish a factual context [of appropriate care] which, had it been credited by the [juvenile] court, might have led to a different decision." (*Charmice G., supra*, 66 Cal.App.4th at p. 664.) The point is unavailing in light of our standard of review.

Mother's observations that M.R.'s teacher expressed no behavioral concerns and had good things to say about mother, and mother's further observation that she had arranged for care of M.R., are all circumstances that could have been credited by the juvenile court. (See *Charmice G., supra*, 66 Cal.App.4th at p. 664.) But they do not require reversal of the judgment.

12

There was sufficient evidence that M.R. would be at substantial risk of serious physical harm or illness if returned to the family home at the time of the jurisdiction hearing.

## II

Mother next contends the evidence does not support the disposition order removing M.R. from her physical custody. The Department asserts the contention is forfeited.

Citing *In re E.A.* (2012) 209 Cal.App.4th 787, 790-791, the Department contends mother's "pro forma" objection to out-of-home placement and request that the child be released to her care do "not avoid forfeiture of the issue on appeal" because they do "not afford the trial court an opportunity to correct error at the trial court level." But *E.A.* is distinguishable. The court in *E.A.* held that the father's nonspecific objection forfeited claims that it was error to deny visitation while he was incarcerated and that jurisdiction could not be based on the abuse of children who were not full siblings. (*Ibid.*) The father in that case did not challenge an out-of-home placement order on the ground it lacked evidentiary support, and the reviewing court had no occasion to hold that such a claim must be made in the first instance in the juvenile court. We will consider mother's contention on the merits.

Regarding her claim of insufficient evidence, mother repeats her argument that social workers and law enforcement visited the family home several times and found it inappropriate on only one occasion. She claims she had been taking good care of M.R., made sure he attended school, and was responsive to the teacher's interactions. Mother claims she had multiple respite care workers available to help with M.R. and it was not necessary to remove him from her in order to protect him.

To support an order removing a child from parental custody, the juvenile court must find clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor

13

if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) The juvenile court must also "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (d).)

" 'The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home. [Citation.]' [Citation.] ' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.]' [Citation.] We review a dispositional order removing a child from parental custody for substantial evidence." (*John M., supra*, 212 Cal.App.4th at p. 1126.)

We have already concluded there was substantial evidence to support the jurisdictional findings. Those findings are prima facie evidence that M.R. cannot safely remain in the home. (*John M., supra*, 212 Cal.App.4th at p. 1126.) Mother was not present at the jurisdiction and disposition hearing and she did not present any contrary evidence. The juvenile court properly found that the evidence supporting jurisdiction rose to the level of clear and convincing evidence.

Mother relies on *Steve W., supra*, 217 Cal.App.3d 10, in which the child was removed from the physical custody of his mother, herself the survivor of a previous violent relationship, because the mother's current boyfriend (the child's father) had battered and killed the child's five-year-old half brother and was incarcerated. (*Id*. at p. 12.) The juvenile court had worried that the mother would enter a new relationship with "yet another abusive type of person" even though she had shown remorse and was engaged in services to address domestic violence. (*Id*. at p. 22.) The reviewing court held that the juvenile court's removal order was supported by "little more

14

than speculation" that the mother would enter a new relationship that was detrimental to the child. (*Ibid.*)

The present case is distinguishable from *Steve W.* because this case does not involve speculative concerns. Moreover, mother was personally responsible for the conditions in the home and no evidence suggested that she would remedy those conditions personally or through the services of a person who could properly maintain the home.

Mother nevertheless claims the juvenile court speculated when it concluded the "unsuitable" condition of the home on July 28, 2014, represented "the new normal in the family home." But the juvenile court had evidence of approximately 16 telephone calls that law enforcement had received from relatives and neighbors since April 2014 in which the callers were "concerned about the child and requesting a welfare check of the child, a check on the mother's substance issues, and the conditions of the home." Even before April 2014, there had been reports of dog feces in September 2010, mold and toxic waste in April 2011, mold in October 2011, M.R. defecating on the floor in April 2012, garbage piled on the deck in August 2013, the house cluttered with trash in September 2013, and dog feces on the floor in November 2013.

On this record, the juvenile court could fairly infer that mother's inability to properly maintain her home was of longstanding duration and that the worsened conditions observed on July 28, 2014, were not likely to be temporary.

In any event, this was not a case simply of a dirty home. As we have noted, mother personally neglected M.R., refused assistance from the Department and from Alta California Regional Center, and relied on a methamphetamine abuser to provide the care she should have been providing. Mother failed to supervise the substance abuser and keep M.R. safe from other substance abusers in the home. Approximately 12 days prior to the hearing, mother told the social worker that she had been bedridden since M.R. was removed from her care and was too ill to be interviewed on the telephone. No evidence

15

suggested that mother's condition improved sufficiently in the ensuing 12 days to enable her to furnish proper care to M.R.  There is sufficient evidence to support the disposition order.

## DISPOSITION

The judgment is affirmed.


      MAURO      , J.


We concur:


      ROBIE      , Acting P. J.


      DUARTE      , J.